UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
——

| | | |
|---|---|---|
| DANIEL A. AVILES, # 280749, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:02-cv-324 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| MARY BERGHUIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner, through counsel, pursuant to 28 U.S.C. § 2254.  Petitioner's convictions stem from the May 30, 1998 killing of Roy Saldana and gun shots fired at Noel Saldana on the same date.  On December 16, 1998, a VanBuren County Circuit Court jury found petitioner guilty of second-degree murder, MICH. COMP. LAWS § 750.317, felonious assault, MICH. COMP. LAWS § 750.82, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS §750.227b.  On February 8, 1999, petitioner was sentenced to 18-to-45 years' imprisonment on the murder conviction, 32-to-48 months on the felonious assault conviction, and a consecutive two-year prison term on the felony-firearm conviction.  After unsuccessful efforts to overturn his conviction in the Michigan courts, petitioner brought this habeas corpus proceeding.

The initial habeas corpus petition raised the same four grounds reviewed and rejected by the Michigan Court of Appeals: (1) that petitioner's rights under the Sixth Amendment's Confrontation Clause were violated when an officer testified concerning a co-defendant's statement

and the co-defendant was not available for cross-examination; (2) that petitioner's pretrial statement was involuntary such that its use at trial violated his rights under the Fourteenth Amendment's Due Process Clause; (3) that the trial court's instruction informing the jury that the statement was voluntary constituted error; and (4) that the trial court's instruction that petitioner could be found guilty as an aider and abettor even if he did not share the same intent of his accomplice was erroneous.  (Petition ¶ 14, docket # 1).   This court allowed petitioner to amend his petition to add a fifth ground claiming ineffective assistance of appellate counsel for failure to file a timely application for discretionary review by the Michigan Supreme Court.  Resolution of this case has been delayed under the stay-and-abeyance procedure which allowed petitioner to return to state court and exhaust his available remedies on his claim of ineffective assistance of appellate counsel.[1]

Respondent argues that all the grounds raised by petitioner are barred by procedural defaults.  (docket #s 16, 58).  Upon review,  I recommend that the petition be denied for lack of merit in all grounds raised.

---

[1] On October 19, 2004, the court entered an order staying proceedings under the Sixth Circuit's precedent predating the framework established by the Supreme Court's decision in *Rhines v. Weber*, 544 U.S. 269 (2005).  In *Rhines*, the Supreme Court held that stay and abeyance is not available where the unexhausted claim is "plainly meritless."  544 U.S. at 277.  The Sixth Circuit's pre-*Rhines* standard was more of a procedural exercise that did not involve examination of the merits of the unexhausted claim.  *See Palmer v. Carlton*, 276 F.3d 777, 781 (6th Cir. 2002)("A district court should dismiss only the unexhausted claims in the habeas petition and stay further proceedings on the remaining portion until after the petitioner has exhausted his/her remedies in state court.").  Thus, petitioner received an opportunity to return to state court and exhaust his available remedies on a claim of ineffective assistance of counsel in connection with an application for discretionary review by the Michigan Supreme Court.  On March 7, 2008, petitioner filed a motion to lift the stay of proceedings.  (docket # 53).  On March 10, 2008, the court lifted the stay of proceedings and returned the case to the active docket.  On March 15, 2008, the court granted petitioner's motion to amend his petition.  (docket # 57).  Respondent filed a supplemental answer.  (docket # 58).  On June 10, 2009, respondent filed the supplemental Rule 5 material.  (docket #s 61, 62).

## Procedural History

**A.**      **Pretrial Proceedings**

1.      District Court

Petitioner was charged with open murder[2] in causing the death of Roy Saldana, assault with intent to murder Noel Saldana, assault with intent to murder Juan Cruz, and possession of a firearm in the commission of the aforementioned felony offenses.  He received a preliminary examination in the 7th District Court for VanBuren County in June 1998.  At the conclusion of the preliminary examination hearing, the district judge bound over petitioner for trial on all charges. (Preliminary Examination Transcript, 6-8, docket # 19).

2.      Circuit Court

a.      Motion to Suppress

On November 20, 1998, Van Buren County Circuit Court Judge William C. Buhl conducted a lengthy hearing on petitioner's motion to suppress the incriminating videotaped statement he gave to police on May 31, 1998 on the ground that the statement was involuntarily made.  (Hearing Transcript (HT), docket # 22).  Judge Buhl had the opportunity to review the videotape, examine the transcript of the significant portions of the recording, and consider the testimony he received from petitioner and Michigan State Police Officer Rafael Turanzas.  Petitioner was arrested near Decatur, Michigan, around 11:00 a.m. on May 31, 2008.  (HT, 4).  Officer Turanzas read him his *Miranda* rights in Spanish.  (HT, 5, 20, 31-32). Officer Turanzas was born

---

[2]Under Michigan law, an open murder charge allows the jury to return a verdict of first-degree murder, second-degree murder, or manslaughter, as the facts dictate.  *See People v. Johnson*, 398 N.W.2d 219 (Mich. 1986).

in Mexico, and Spanish was his native language. (HT, 31). Petitioner testified that he was 23-years-old and that he had been living in the United States for approximately ten years. (HT, 4, 14, 18). Officer Turanzas perceived no difficulty communicating with petitioner. (HT, 31). After being read his rights, petitioner expressed his willingness to cooperate with the police. (HT, 32). Officer Turanzas testified that petitioner never asked for an attorney. (HT, 32, 46).

Petitioner was transported to the Michigan State Police post in Paw Paw, where he was interviewed by Detective Sergeant VanLopik with Officer Turanzas serving primarily as an interpreter. (HT, 47). Petitioner conceded that he had been present at the location on County Road 681 where the shootings had occurred. (HT, 23, 34-35). He initially denied having a weapon and claimed that he had only been present to retrieve his father, Apolinar Aviles. (HT, 34-35, 57-58). Petitioner changed his version of events during questioning by Border Patrol Agent John King, when he was shown the statement King had obtained from petitioner's cousin, Israel Torres. (HT, 24, 35). Petitioner was not threatened by King or Turanzas. (HT, 35). Petitioner conceded that he had a gun at the scene where the shootings occurred, but now claimed that he had only discharged his pistol into the air. (HT, 12). The next day, petitioner recanted the version of events and denied that he had a gun. (HT, 59).

Petitioner testified in support of his motion to suppress. He stated that Turanzas read him his rights in Spanish, but claimed that he only understood his right to an attorney. (HT, 5). He claimed that he made multiple "off camera" requests for an attorney during breaks when he went to the restroom. (HT, 7, 9, 25). He never advised Officer Turanzas of any difficulty understanding Turanzas's Spanish. (HT, 22, 41). VanLopik's questioning was lengthy, but relatively relaxed, and focused on gathering facts. (HT, 7, 9, 36). Petitioner stated that he had not eaten breakfast on the

-4-

day he was arrested.  (HT, 16).  He testified that during questioning, he drank a Coke and ate four M&Ms.  (HT, 10).  Questioning by Agent King took an estimated thirty minutes.  (HT, 54, 57).  Petitioner claimed that he had felt pressured to give his statement about firing shots in the air because King stated that he had sent petitioner's father-in-law to prison and was going to do the same thing to petitioner.  (HT, 11-12).  "I just said that I had shot up in the air because they wouldn't leave me in peace."  (HT, 12).

On November 24, 2008,  Judge Buhl issued his decision denying petitioner's motion to suppress.  He found that petitioner had been informed of his *Miranda* rights in Spanish and had knowingly and voluntarily waived them and gave his incriminating statements.  He rejected petitioner's claim that he was denied his right to counsel.  Judge Buhl noted that petitioner never invoked his right to counsel anywhere on the roughly six hours of video tape.  He rejected petitioner's claim that his incriminating statement that he had a gun and fired it multiple times was the result of coercion.  Petitioner's assertion that he made statements that would incriminate him and put him in jail out of fear of going to jail "made little sense."  Even though seven or eight hours of questioning was lengthy and petitioner had little to eat or drink, the officers had endured the same conditions.  (docket # 49, Ex. 4).

**B.      Trial**

Petitioner's trial began December 8, 1998, and concluded with the jury's verdicts on December 18, 1998.[3]  (Trial Transcripts "TT I-VII," docket #s 23-30).  Witnesses described a series of events occurring on Saturday, May 30, 1998, which escalated and eventually led to Roy Saldana's

---

[3]Co-defendant Israel Torres waived his right to a jury and received a bench trial.

being stabbed multiple times and killed by a shot in the back. Roy Saldana was found lying face down in a deep ditch along the edge of County Road 681. (TT II, 263). A forensic pathologist testified that Roy Saldana had a total of eleven stab wounds but did not die as a result of those injuries. (TT II, 64-67). The victim had two gunshot wounds. (TT II, 67). One wound was a grazing gunshot wound of the anterior abdominal wall which did not penetrate into the abdominal cavity. (TT II, 70). The fatal shot had been fired into the victim's back below his left shoulder. (TT II, 73-74). The residue indicated that it had been a contact wound with the muzzle of the gun being in contact with Roy Saldana's body when the fatal shot had been fired. The .22 caliber bullet went through his left lung, heart, ascending aorta, and right lung, but failed to completely exit the body and was recovered. (TT II, 68-70). Multiple witnesses placed petitioner at the scene with a pistol in his hand on the night Roy Saldana was shot and killed.

1.     Petitioner's Confrontation with Noe and Santos Cruz

Noe Cruz testified that petitioner was a member of the Sur Treces ("South 13") gang and that petitioner went by the street name of "Gonzo." (TT III, 5, 6). Noe Cruz denied being a member of a rival gang. (TT III, 30). On May 30, 1998, at about 8:45 p.m., petitioner drove by the Juan Reyna residence on County Road 681, where Noe Cruz and others were attending a party. (TT V, 216). Noe Cruz stated that he threw a beer bottle at petitioner's green Dodge Stealth when petitioner drove by "throwing gang signs." Noe Cruz, his cousin Santos Cruz, and others got into their cars, chased down petitioner and forced him to stop his car. (TT III, 9, 34, 36). Petitioner pulled over and was seated in the driver's seat when Noe Cruz came up and punched him in the face several times through the open window. (TT III, 10, 40, 92). Santos Cruz opened the car door and

kicked petitioner.  (TT III, 11, 40, 83, 92, 99).   Santos's brother, Juan Cruz, showed up and convinced Noe and Santos to stop fighting, and the group left.  (TT III, 11, 101).

      2.    <u>Confrontation at Earl's Grocery</u>

      A second incident occurred before 11:00 p.m. on the night of May 30, 1998, at Earl's Grocery.  Noe Cruz was at the convenience store arguing with Joe Galaviz.  (TT III, 14, 43 138). Roy Saldana pulled into the parking lot with his younger brother Noel Saldana as his passenger.  (TT III, 138).   Ray Saldana, an older sibling of Roy and Noel, arrived in his car.  (TT III, 109, 139). Petitioner then pulled his green Dodge Stealth in behind the Galaviz vehicle.  Petitioner's passengers were his younger brother Alfredo Aviles and his cousin Israel Torres.  (TT III, 13-16, 113, 139, 227-29; TT V, 227-29).  Noel Saldana denied being a member of the rival Latin Kings gang.  (TT III, 204-06).  Noel testified that at one point, he got out of Roy Saldana's car with a baseball bat because he was concerned that the other group might "jump" his brother Roy and Noe Cruz.  Petitioner, Alfredo Aviles, and Israel Torres got back into petitioner's car and drove away after the store's owner came outside and threatened to call the police.  (TT III, 141-43, 229-31; TT V, 229-30).

      As it happened, the police arrived moments later.  Michigan State Police Troopers Chris Suarez and Rick Johnson were en route to investigate another complaint when they saw several subjects standing on the side of the parking lot at Earl's Grocery.  Noe Cruz and an unidentified man appeared to be facing off and ready to fight.  (TT II, 7, 40, 48-49, 196).  The troopers stopped at Earl's and separated the potential combatants.  The men shook hands, told the police that there would be no more problems that night, and went their separate ways.  (TT II, 49-50).  Trooper Suarez recognized two individuals: Noe Cruz and Roy Saldana.  (TT II, 8, 39).  It appeared that both

Noe Cruz and Roy Saldana had been drinking, with Saldana being the more intoxicated of the two men.  (TT II, 9, 197).  Troopers Suarez and Johnson spent about ten minutes at Earl's and cleared the scene at approximately 11 p.m.  (TT II, 10, 41, 45).

### 3.   Shootings at the Juan Reyna Residence

Roy Saldana, Noel Saldana, and Noe Cruz went back to the Reyna residence on County Road 681 in Roy's car.  (TT III, 15, 46, 143-44).  Ray Saldana followed them to the same location and attempted, without success, to convince his brother Roy to go home, and then left.  (TT III, 108-09, 116, 145).  A few minutes thereafter, Roy Saldana was sitting in the driver's seat of his Monte Carlo in the driveway.  Noe Cruz was standing outside the car by the front passenger side, and Noel Cruz was in the back seat when a white Mercury Marquis driven by petitioner's father, Apolinar Aviles, pulled in the driveway behind Roy Saldana's car.  (TT III, 15, 149-51, 190).

Apolinar got out of the car and stated that he was looking for Noe Cruz.  (TT III, 48, 152).  When Noe responded, Apolinar stated, "you beat the s___ out of my son," pulled out a rifle, fired it towards Noe, but hit nothing.  (TT III, 15, 21, 50-51,153-54).  A spent 30/30 casing was found at the scene.  (TT III, 260-61).  Apolinar then came from behind his car door, got closer, and hit Noe Cruz with a shotgun blast.  (TT III, 15, 21, 24, 50-51, 65, 156, 263).  Noe Cruz crawled away.  (TT III, 27, 53-54).  Apolinar then attempted to shoot towards Roy Saldana, but his gun just made a clicking noise.  Roy grabbed the barrel of the gun as Apolinar was trying to reload.  (TT III, 159).  While Roy and Apolinar wrestled for control of the shotgun, Noel was able to exit the passenger side of the Monte Carlo with his baseball bat.  He came around the car and hit Apolinar in the head.  (TT II 226-27; TT III, 162-63, 197).  The baseball bat was later found next to the Monte

Carlo. (TT III, 264). Apolinar fell to the ground, and Roy took his gun. Roy hit Apolinar in the head with the gun. Petitioner then pulled up near the end of the Reyna's driveway in his green Dodge Stealth. (TT III, 164-66, 190, 199-200). Three men got out of the car and multiple gunshots were fired. All three men ended up behind the green car holding their arms in a position as if they had weapons. (TT III, 169, 224, 238-39). Roy Saldana had Apolinar's shotgun and began moving towards the gunfire coming from behind the Stealth. Roy fired a shot, and from the broken glass and pellets found embedded in the Stealth's window trim, it was apparent that Roy's shot broke petitioner's car window. (TT III, 171-72, 192, 233, 255-58). Roy Saldana then ran away on a course roughly parallel to the roadway with petitioner and Alfredo Aviles chasing after him and firing shots. (TT III, 174).

The shooting had subsided by the time Juan Cruz pulled his car into the driveway at the Reyna residence. Juan saw Apolinar on the ground, bleeding from a head wound . (TT II, 100, 151). Juan got out of his car and saw three people running up the road on foot towards him. (TT II, 101, 137). Juan Cruz testified that he saw petitioner with a handgun. (TT II, 109, 146). He further testified that Israel Torres told petitioner to shoot Cruz. Cruz then started running as he saw petitioner raising his gun. He heard shots fired but was not hit. Juan Cruz ran to a nearby church from which the 911 call was placed. (TT II, 112-15, 147). Noel Saldana testified that he heard "victory yells" as petitioner's Stealth and the white Mercury Marquis drove away. (TT III, 181-82).

Michigan State Police Troopers Johnson and Suarez received the 911 call of shots fired at 11:12 p.m. and arrived at the Reyna residence at 11:15 p.m. Trooper Johnson observed broken glass on the roadway in front to the Reyna residence. Noel Saldana informed the troopers that his brother Roy and friend Noe Cruz had been shot and fled into nearby woods. (TT II, 11-13,

33, 174-75). Noel stated that the individuals who had done the shooting had left the scene. (TT II, 13). Trooper Suarez observed Roy Saldana's white Monte Carlo parked in the driveway with its rear window smashed out and a blood smear covering the entire length of the driver's side of the vehicle. (TT II, 14-15, 175, 177). Suarez found a shotgun abandoned about two to four feet off the east side of County Road 681 and about two hundred feet south of the residence. (TT II, 16-17, 34-34, 212).

Trooper Johnson saw Juan Cruz come running across a field back towards the Reyna residence. Juan was in an excited state because he had recently had gunshots fired in his direction. (TT II, 180-82, 187-88, 198). Juan had been the driver of the Cavalier police found in the driveway. (TT II, 182). Juan Cruz reported that petitioner had been holding a silver handgun when he approached from the direction where Roy Saldana's body was later found. Petitioner pulled the mechanism to load a round into the chamber and told Juan Cruz that his brother had really "f__ up." A second Hispanic male named Paco (Israel Torres's street name) had instructed petitioner to "shoot the f__ out" of Juan Cruz too. Cruz turned and ran when he saw petitioner raising the gun into firing position. Juan Cruz indicated that he heard four or five shots as he was running away. (TT II, 112-14, 183-84, 194, 204, 206).

Police found Noe Cruz behind a small camper trailer with a sheet of construction material or aluminum siding covering him. He was bleeding profusely from the shotgun wound in the groin area of his left leg, but was still conscious. (TT II, 21-22, 176-78, 188). He told police that petitioner had shot him or was one of the shooters, that a second individual named Paco had been involved, and that the gunmen had fled the scene in a green vehicle. (TT II, 23-25, 44, 56-58, 179). Noe Cruz was placed in an ambulance, and police continued to search for Roy Saldana. (TT II, 26, 191). Roy Saldana's lifeless body was found at approximately 11:40 p.m. in the shallow water at

the bottom of the steep drainage ditch not far from where Trooper Suarez had found the shotgun alongside County Road 681. Roy Saldana was pronounced dead at the scene at 11:44 p.m. (TT II, 27-29, 35, 41-42, 190, 195-96, 263-64). Police found numerous spent .22 casings, including one that was only eighteen inches from Roy Saldana's body. (TT III, 249, 255, 259-60, 265-66).

Police later found the green Dodge Stealth and white Mercury Marquis at petitioner's residence. The Stealth's window was broken out and the broken glass was consistent with the broken glass found at the Reyna residence. Shotgun pellets were found in the molding around the car's passenger window. There was blood in the back seat area of the Stealth. (TT III, 257, 264, 271-74). No blood stains were found inside the Mercury. (TT III, 274). The Stealth was registered in Apolinar's name and the Mercury in petitioner's name. (TT III, 32). Police also found ammunition for a .22, a 30/30, and a .20 gauge shotgun at petitioner's residence. (TT III, 268-70).

The rear window of Roy Saldana's Monte Carlo had been shot out with a small caliber weapon, consistent with a shot from a .22. Police found a bullet hole that went through the passenger side seat belt and then exited through the molding against the door. (TT III, 275-76).

4.    Petitioner's Statements to the Police

Petitioner was arrested shortly after on Sunday, May 31, 1998, at approximately 11 a.m. as he was driving away from his residence in a van registered to Apolinar. (TT IV, 6-7, 66, 78). State Police Detective Sergeant David VanLopik testified that petitioner was advised of his *Miranda* rights at the time of his arrest. (TT IV, 68). Petitioner elected to waive his right to remain silent and he made statements to the police. (TT IV, 69). The initial statement petitioner offered inside VanLopik's patrol car was that he had been playing soccer on the evening of May 30th, drove the

-11-

green Dodge Stealth to one of the camps near Hilltop Farms, had a couple of beers, and returned to his residence at approximately 11:30 p.m.  Petitioner did not indicate that he had any knowledge of the shootings that had occurred.  (TT IV, 70-71).   Detective Sergeant VanLopik transported petitioner to the Paw Paw State Police post.  (TT IV, 72).

VanLopik questioned petitioner in an effort to obtain a detailed chronological statement regarding what petitioner had been doing and who he had been with the previous day.  (TT IV, 74).  Petitioner related that he had picked up Israel Torres and Juan Catana on the way to their soccer game.  Petitioner stated that he left the game at about 8:30 p.m. without Torres and Catana. He left the soccer field through the gate onto County Road 681.  He stated that as he was driving by a residence located on 681, Noe Cruz threw a beer bottle at him.  He stated that Noe Cruz, Santos Cruz and others chased him down in their cars and forced him to the side of the road.  (TT IV, 77-78).  They punched him and tried to drag him out of the car.  Detective Sergeant VanLopik did not observe any injuries.  (TT IV, 78).  During the questioning by VanLopik, petitioner said nothing about having a gun or shooting it.  (TT V, 26).

During the cross-examination of Detective VanLopik about reading petitioner his *Miranda* rights, the prosecutor made an objection.  The court overruled the objection, and the jury was instructed that the court had determined that petitioner's statement would come into evidence, but it was entirely up to the jury to determine credibility and what, if any weight, should be given to that statement:

Q      Okay.  So you're now aware -- maybe you weren't at the time -- you're aware that there are rights cards written in Spanish?

A      Yes.

-12-

Q        But on the 31st of May, no such card was provided?

MR KAPS: I want to object that we have had that issue as far as with volunteering he made statements has already been determined.  I don't have a problem with some questions regarding the entire events, but --

MR. LAAKSONEN: May we approach the bench?

THE COURT: Members of the jury, with respect to statements made by Mr. Daniel Aviles, the Court has already determined whether or not those statements will come into evidence.  In other words, some things don't get into evidence.  That statement has not been suppressed from evidence.  It will come in and has come into evidence.  That's one issue I have decided and that's what Mr. Kaps refers to.  And that specifically deals with *Miranda* and also might deal with the question of whether or not it should not come in because of the voluntariness.
    The other issue is how much weight you give to that statement.  And I'm going to allow Mr. Banyon to question with respect to what he understood this defendant understood as to what he was told because you have to determine whether or not you think the statements are reliable with respect to their voluntariness or whether or not he was coerced or pressure was put on him.  In other words, the weight and credit you put on the evidence I allow to come in is your decision.  So that you clearly understand why Mr. Kaps said what he said, he is correct.  I will overrule the objection to the line of testimony as long as Mr. Banyon's not asking you to apply Miranda versus Arizona.  His requesting is whether or not the statement was credible, whether or not he said what he said was credible and should be given any weight.
    So with that explanation, I would overrule the objection and allow the testimony so long as it doesn't go into the areas I've indicated.

(TT IV, 92-94).  Outside the presence of the jury, petitioner's attorney moved for a mistrial because

the jury had been informed of the court's ruling that petitioner's statement was admissible.  (TT IV,

111).  The court denied the motion:

THE COURT: Anything further?  Well, the motion for mistrial I'm going to deny.  I think the Court accurately stated the law to the jury and left the jury with the understanding that they can listen to the evidence.  And so far as it might indicate the credibility of the statement given by the Defendant was something that they could take into consideration to disregard if they found it was given under pressure or involuntary way.  But the Court felt it was important to let the jury know they don't make the decision whether it comes into it, only what weight to give it.
    I deny the motion.

-13-

(TT IV, 112-13).

Agent John King testified that he was contacted by the Michigan State Police on Sunday, May 31, 1998, and asked to provide assistance in investigating a homicide.  King interviewed petitioner and Israel Torres at the Michigan State Police post.  (TT V, 45-47).  King's interview with Daniel Aviles was videotaped.  (TT V, 47).  King testified that Officer Turanzas was present during questioning.   (TT V, 47).   Petitioner's initial version of events denied any involvement in the shootings:

Q    During your conversation with Daniel Aviles, did you ask him about the events of the previous evening or early morning hours of Saturday night of May 30th?

A    Yes, sir, I did.

Q    Initially, what did Mr. Aviles advise you as far as his knowledge and his actions on the previous night?

A    I had received information from the -- observing their interview that Mr. Aviles had denied any activity other than what had occurred previous in the evening prior to this assault taking place with his father's involvement.  And then Mr. Aviles stated that -- I initially started out with the fact that I had-- how I knew Mr. Aviles and I knew his family, his wife's family.   And then went into the fact that -- about what had transpired that day, that I knew what had occurred from talking to other individuals.  And he basically denied having any involvement in this situation, which I understood he was more involved than he's claiming.  And then he stated that, for instance, he didn't have a pistol.

Q    I'm sorry?

A    He denied having a pistol, possession of a pistol.

Q    All right.

A    Which I had affirmation that he was in possession of a pistol.

Q    All right.
     So his original story, during your contact with him, did he acknowledge being at the residence on County Road 681 where this incident took place?

-14-

A       Yes, sir, he did.

(TT V, 48-49).

Petitioner later gave Agent King a significantly different and far more detailed version of events, admitting a greater level of involvement and showing King where he had hidden the .22 caliber automatic pistol before the shootings and where he later disposed of it.  King's testimony included the following summary of petitioner's recorded statement:

Q       Did there come a point in time where his story changed about what he knew about this situation on County Road 681?

A       Yes, sir, it did.

Q       In what way did it change?

A       I advised Mr. Aviles that I understood that being beat up or he claimed to be molested earlier, that he was upset.  A group of gentlemen had apparently assaulted him.  I could tell that his temper may have risen over the situation and that he went-- he'd returned to the camp where he lived and saw his father, but he didn't want to tell his father what had occurred.  So he went to the migrant camp on 681 just down from where Mr. Reyna lives and met his cousin, Israel Torres.  And then at that point told Israel what had occurred.  His father arrived to the scene.  His father was intoxicated and his father was indicating that he was going to get some kind of revenge over the situation, that his father was driving a white Lincoln, I'm sorry, Mercury Marquis, and then his father exited the location in haste.  And approximately five minutes later Israel Torres and I understand Alfredo and Daniel left in a green car to go find out what their father was doing.  He stated that prior to leaving the scene of the migrant camp of his cousin's he had hidden a weapon across the street and he went over to that location and retrieved this weapon.  I asked him what caliber it was.  He stated it was a .22.  I asked him if it were a revolver or pistol or automatic, and he stated it was an automatic.  He stated he got back to the location of the vehicle and they all three left with himself being the driver of the green vehicle, his brother, which would be Alfredo being the passenger in the right front, and his cousin, Israel Torres, in the right rear of the vehicle.  It's a short distance from the migrant camp going northbound to where his father was later found.  He was driving north and that was sometime after eight o'clock in the evening they went northbound.  And then he observed his white -- which is his vehicle I believe.  This white Mercury was inside a driveway with the door open and the lights on and they observed that his father-- he observed that his father was lying on the ground being surrounded by several

-15-

individuals and one individual was striking his father with something he described
as a shotgun.[4]

(TT V, 50-51).

Petitioner advised King that after Apolinar left to confront Noe Cruz, petitioner
retrieved a .22 caliber pistol that he had secreted in some nearby drainage pipes.  (TT V, 10,  57-59).
Petitioner showed Agent King the location where the gun had been hidden:

> Q  Where did he show you that he had supposedly retrieved the weapon from?
>
> A  Approximately a tenth of a mile on County Road 681 across from the migrant camp
> and where he was with his cousin, Israel Torres.  If you cross the street going
> westbound into the field, there is a farm road that goes along the orchards and there
> is a pile of aluminum pipes that are used for irrigation systems.  He walked up to one
> of those pipes near the ground and indicated that it came out of this specific pipe and
> pointed to one of the various pipes.  I asked him -- I got down and looked inside the
> pipe and I could see a -- where something had made a mark or scratch in that pipe on
> the inside.  The pipe was corroded or had mildew type corrosion on it and you could
> see a shiny mark where something had made a scratch along the end of it, on a line
> parallel with the pipe.

(TT V, 58).

Petitioner stated that after he had the pistol he drove the green Stealth to the Reyna
residence with his brother Alfredo Aviles and cousin Israel Torres as his passengers.  (TT V, 11, 59).
Petitioner stated that he observed the white Mercury in the driveway of the Reyna residence and that
his father was on the ground, surrounded by several individuals, one of whom was hitting Apolinar
with a shotgun.  (TT V, 11, 51).  Petitioner stated that he immediately pulled the car off the road just
past the driveway, got out of the car and fired "approximately five or six rounds in the air with his

_____

[4]Defense counsel did not object to King's testifying in narrative form.  In this manner, the
jury received an exculpatory version of events without the necessity of having petitioner testify.
Petitioner later elected to take the witness stand.

-16-

pistol." (TT V, 51).  Petitioner stated that the group near Apolinar dispersed and fled back towards

the house, except for one individual who started down the driveway towards the road and then

veered south parallel to County Road 681.  (TT V, 52).  Petitioner stated that he "fired two to three

rounds in the direction of this individual." (TT V, 13, 53).  He stated that Israel Torres and Alfredo

did not fire the pistol.  (TT V, 56).  He stated that Israel helped him get Apolinar into the green car

and the three of them left the scene.  (TT V, 14).  Petitioner stated that he disposed of the gun by

throwing it into a swampy area along 88th Street and showed King the location.  (TT V, 14, 58).

The next day, petitioner recanted this version of events and implicated his brother Alfredo Aviles

as the person using the pistol.  (TT V, 16).

Defense counsel's strategy for dealing with petitioner's recorded admissions was to

aggressively cross-examine Agent King, using questions suggesting that King had "planted the

seeds" of the version of events where petitioner possessed and fired a gun and that petitioner was

eventually worn down or intimidated to the point where he "gave in" and agreed with King's

fabricated version of events.  King testified that he mentioned having sent petitioner's father-in-law

to prison not for purposes of intimidating petitioner, but because he wanted petitioner to tell him the

truth and wanted him to know that he was familiar enough with the people around petitioner that he

would be able to distinguish the truth from fiction.  (TT V, 62-63).  King stated that he mentioned

petitioner's family and the possibility of petitioner spending the rest of his life in prison because he

"wanted him to understand the seriousness of the circumstances."

> Q    Talking about the man's family and spending the rest of his life in prison and you
>      didn't intend to threaten or intimidate him in any way by making those statements?
>
> A    No, sir.

Q       Okay.
        And after that, um, essentially what you tried to do for Daniel Aviles is give him a story and have him adopt that story.  Would you agree with that ?

A       No, sir.

(TT V, 64-65).   In the process of denying that the "story" was a fiction of his own invention, Agent

King made a reference to Israel Torres's statement:

Q       So you knew he was beaten up earlier and didn't you in effect say, well, look, I could understand why you have a gun.  I mean if five guys beat me or ten guys beat me, I would want a gun for my protection too, right?

A       Yes, sir.

Q       You told him that, is that correct?

A       That's correct.

Q       And then you got kind of what happened to his father, right?

A       Based on what I had been told, yes, sir.

Q       Correct.  You were aware that his father had been beaten and you started questioning Daniel, you know, when you got there he said he got to the scene and saw this man beating his father with a shotgun, right?

A       Yes, sir, that's what I was told.

Q       And basically you told him look, if my father was there getting beat with a shotgun and I had a gun for my own protection, I'd fire the gun to get these people away from my father, words to that effect?

A       That's correct.

Q       Kind of leading him into that.  Okay.
        So it was really you who was kind of planting the seeds that he didn't really do anything wrong, he was just there, had the gun to protect himself because he had been beaten, and then used the gun to fire some shots to protect his father.  And there was really nothing wrong with that because that's his father and when you suggested that story to him and eventually he agreed with it, would that be fair to say.

-18-

> A        The story I gave Mr. Aviles was a story I had obtained from Mr. Torres and I wanted
>            Mr. Aviles to understand.

(TT V, 65-66).  Petitioner's attorney objected that King's answer was improper and unresponsive.

The court overruled the objection.  (TT V, 66-67).  Outside the jury's presence, the court  went on

to explain that   defense counsel's question had opened the door by inviting King to deny the

assertion of a manufactured version of events and to identify the source:

> . . . I realize the thrust of your question is that the witness is putting words in the mouth of
> your client, suggesting to him a exculpable version of events that -- but once we get into that
> area, I'm afraid that opens the door for the witness to say I didn't manufacture this
> exculpable version of the event, I was taking it from what another participant had told me.
> That's my problem, which gets into the area of admitting admissions of Mr. Torres in Mr.
> Avile's case.  That's my dilemma because it is responsive to where you were going.  It does
> take us there.

(TT V, 67-68).  The court left the matter with a caution not to get into what Torres may have said

that possibly incriminated petitioner.  (TT V, 69).  The court noted that the identification of Torres

as a source of an exculpatory version of events was not particularly harmful to petitioner:  "[I]f they

are saying the same things and it's an exclulpatory type of version of events and it's consistent, it is

probably more helpful than unhelpful."  (TT V, 69).  Israel Torres's statement was never introduced

into evidence during petitioner's trial.


           5.        Petitioner's Trial Testimony

           Petitioner elected to take the witness stand and testify in his own defense.  (TT V,

204-48; TT VI, 3-116).  He denied being a member of the Sur Treces gang (TT V, 209-11; TT VI,

6),  denied that his tattoos were gang-related (TT VI, 109), and denied flashing gang signs before

being assaulted by Noe and Santos Cruz.  (TT V, 218; TT VI, 14).  He testified that his younger

brother Alfredo was a member of the Sur Treces gang and that he did not know where Alfredo was at the time of trial.  (TT V, 210; TT VI, 10).

Petitioner conceded that he had been at Earl's grocery around 11 p.m.  He stated that he saw Noe Cruz arguing with someone and observed Noel Saldana holding a baseball bat.  (TT V, 227-29).  Petitioner left with his brother Alfredo and cousin Israel before the state police arrived.  (TT V, 230).  Petitioner testified that he drove back to Hilltop Camp where he had a conversation with Apolinar during which petitioner related that Noe Cruz hit him earlier that day.  (TT V, 230).  Apolinar then had a ten-to-fifteen-minute conversation with Alfredo.  (TT V, 231; TT VI, 58).  Apolinar then drove off in the white Mercury Marquis without saying where he was going.  (TT V, 232; TT VI, 44).  Petitioner stated that he spent about ten minutes talking to Alfredo and Israel before Alfredo suggested that they go to a store in Hartford for some pop.  (TT V, 232; TT VI, 73-74).  On the drive to the store Alfredo purportedly saw Apolinar's car at the Reyna residence, told petitioner to stop the car, and Alfredo got out of the car and started shooting.  (TT V, 233; TT IV 76-87).

Petitioner repeatedly testified that his brother Alfredo was the only person with a gun (TT V, 240, 247; TT VI, 116).  Petitioner admitted that he was at the Reyna residence where the shootings occurred.  (TT VI, 81).  He testified that he saw Alfredo shooting in the direction of the house.  (TT VI, 83, 86, 87).  He claimed that Alfredo chased Roy Saldana (TT VI, 87) and that he later heard two or three more shots.  (TT VI, 88).  Petitioner testified that he left the Reyna residence with Apolinar and intended to go to the hospital.  Petitioner did not go to the hospital, but instead took Apolinar home.  (TT VI, 96-97).  He testified that he went indoors for a towel and that when he came back to the car Apolinar was gone.  Petitioner testified that he went indoors and fell asleep

-20-

in a chair.  (TT VI, 100-01).  Under this version of events, Apolinar was left wandering around in

the dark outside the house and bleeding profusely from a head wound.  Petitioner testified that he

did not know how the white Mercury made it back to his house.  (TT VI, 104-05).  He denied ever

being in the area where Roy Saldana's body was found.  (TT VI, 106).

Petitioner testified that he was read his *Miranda* rights in Spanish.  (TT V, 241; TT

VI, 26-27).  He conceded that he initially told police that he had been at home and knew nothing

about the shootings.  He said nothing about Alfredo being present. (TT VI, 23).  Petitioner admitted

that he told Agent King that he had a gun and had been shooting it.  (TT V, 244-45).  He stated that

the statement he had given King was false.  (TT V, 245).  He testified that he made up the statement

because it was coerced and he was trying to protect his brother.  (TT V, 242-46).

### 6.    Closing Argument, Jury Instructions, and Jury Verdict

After the close of proofs, the attorneys delivered their closing arguments without

objections.  The prosecutor's closing argument focused on his burden of proof and how the evidence

presented carried that burden.  He argued that petitioner's testimony regarding what happened after

he left Earl's grocery was impossible to accomplish within the twelve-to-fifteen minute time frame

established by the testimony of Troopers Johnson and Suarez.  (docket # 29 at 33-36).  The

prosecutor made a passing reference to King's confrontation of petitioner with information from

"other people," but only in its role as a catalyst for petitioner's detailed statement  (*Id.* at 38).  The

prosecutor argued the implausibility that petitioner supplied an extremely detailed story, followed

by assertions that the story was false, which eventually evolved into petitioner's arguments that

Agent King made up the story and coerced petitioner into adopting parts of it.  (*Id.* at 38-39).

Defense counsel's closing emphasized the prosecution's burden of proof, inconsistencies in testimony and evidence, and why the prosecution's witnesses should not be believed.  (docket # 29 at 47-67; TT VII 3-48).  He argued that petitioner's recorded statement should be given no weight.  (TT VII, 49-58).  Defense counsel argued that petitioner never had a gun and that Agent King had planted the idea that petitioner had a gun.  (TT VII, 59-60).  The defense argued that the absent Alfredo Aviles had killed Roy Saldana and that petitioner had been trying to protect his brother.  (TT VII, 38, 48, 54, 65).  Defense counsel attempted to persuade the jury that his client's trial testimony should be believed.  (TT VII, 65-86).  Among other things, the prosecutor's brief rebuttal noted that it was unlikely that petitioner would have manufactured a false statement putting a gun in his own hands and emphasized that it was up to the jury to decide petitioner's credibility.  (TT VII, 103).

Judge Buhl delivered jury instructions.  His final instructions reiterated that the jury was to determine what weight, if any, should be given to petitioner's statement to the police:

> The prosecution has introduced evidence of statements they claim the Defendant made.  You cannot consider such an out of court statement as evidence against Defendant unless you do the following.  First, you must find that the Defendant actually made the statement as it was given to you.  If you find that the Defendant did not give this statement at all, you should not consider it.  If you find that he made part of the statement, you may consider that part as evidence.  Second, if you find that the Defendant did make the statement, you must decide whether the whole statement or part of it is true.  When you think about whether the statement is true, you should consider how and when the statement was made, as well as all the other evidence in the case.  You may give the statement whatever importance you think it deserves.  You may decide it was very important, or not very important at all.  In deciding this you should once again think about how and when the statement was made and about all of the other evidence in the case.

(TT VII, 113-14).  Judge Buhl delivered Michigan's Standard Criminal Jury Instruction on aiding and abetting, and defense counsel made no objection.  (TT VII, 125-27).

-22-

After the jury had retired to begin its deliberations, it sent a note to Judge Buhl with a question whether "<u>cause</u> meant pulling the fatal shot."  The note went on to state that all the jurors agreed that petitioner had a gun, was firing it at people, was present at the site where Roy Saldana died, and that petitioner had  "<u>at least</u> aided and abetted," but the jury did not know whether petitioner had fired the fatal shot.  The note stated that the jury did not want to "pin pulling the trigger" on petitioner.  The note concluded with a second question: "So what charge is this?"  (Jury Note, copy found in Michigan Supreme Court Record, docket # 61, Defendant-Appellant's Application for Leave to Appeal, Ex. 5).  Judge Buhl instructed the jury that it was not appropriate for the jury to inform him of the state of their deliberations and ask him to supply the answers.  He reiterated that it was the jury's job to determine the facts, to apply the law to those facts, and reach verdicts on the charges against petitioner.  "Cause" could mean acting as the person pulling the trigger or acting as an aider and abettor.  The court repeated the standard jury instruction on aiding and abetting and emphasized that merely being present was not adequate to support a conviction.  Judge Buhl concluded by once again emphasizing that  he did not have a role in finding the facts.  It was the jury's job to find the facts beyond a reasonable doubt and to apply the law to those facts.  (TT VII, 170-78).

The jury later returned verdicts finding petitioner guilty of second-degree murder in the killing of Roy Saldana, felonious assault upon Noel Saldana, and possession of a firearm during the commission of a felony.  The jury found petitioner not guilty on the charge of assault with intent to murder Juan Cruz.  (TT VII, 185-89).  On February 8, 1999, Judge Buhl sentenced petitioner to serve 18-to-45 years on the second-degree murder conviction, 32-to-48 months on the felonious

assault conviction (to be served concurrently), and 2 years on a felony-firearm conviction (to be served consecutively).  (Sentencing Transcript at 9-10, docket # 31).

### C.    Appeal as of Right to Michigan Court of Appeals

Petitioner appealed as of right to the Michigan Court of Appeals.  On March 16, 2001, the Court of Appeals affirmed his convictions and sentence.  (3/16/01 Op., docket # 32).  The Court of Appeals agreed with the trial court's finding that petitioner voluntarily made his recorded statement:

> Whether a defendant's statement was knowing, intelligent, and voluntary is a question of law that we review against the totality of circumstances.  *People v Snider*, 239 Mich App 393, 417; 608 NW2d 502 (2000).  Because this Court affords great deference to the trial court we will not reverse the trial court's findings unless they are clearly erroneous where, after examination of the record, this Court is left with a definite and firm conviction that the trial court made a mistake.  *People v Givans*, 227 Mich App 113, 119; 575 NW2d 84 (1997).

> A criminal defendant's statements are generally inadmissible at trial unless the prosecutor establishes that the statement was voluntary.  *People v Cheatham*, 453 Mich 1, 13; 551 NW2d 355 (1996)(Boyle J.)  On appeal, defendant does not contest that he was advised of his *Miranda* rights.  Rather, defendant claims that his inculpatory statement was involuntary because it was the product of police coercion.

> The use of an involuntary statement coerced by police conduct offends due process under the Fourteenth Amendment.  *People v. Wells*, 238 Mich App 383, 386; 605 NW2d 374 (1999).  The following factors guide our determination whether a confession was voluntary:

>> . . . the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Cipriano* 431 Mich 315, 334; 429 NW2d 781 (1988).]

None of these factors should be given presumptive weight, rather, the controlling inquiry is whether the totality of the circumstances suggests that the statement was freely and voluntarily made. *Id.*; *People v Manning* ___ Mich App __; __ NW2d __ (Docket No. 224898, issued 12/15/00), slip op p 17.

The record reveals that defendant was advised of his *Miranda* rights in Spanish at the time of his arrest before being transported to the police station for questioning. A Spanish speaking member of the Michigan State Police administered the warnings and acted as an interpreter during the following six to seven hours of questioning. Defendant did not inform the police that he was experiencing difficulties understanding their questions, therefore the record does not support defendant's assertion that he was unable to understand the *Miranda* warnings or the investigators' questions. A person speaking to the police by way of a translator is subject to the same standards as one fluent in English. *People v Truong (After Remand)*, 218 Mich App 325, 335; 553 NW2d 692 (1996). Consequently, the police had no heightened obligation to take steps to ensure that defendant understood his *Miranda* rights. *Id.*

Moreover, while acknowledging that defendant had little in the way of sustenance during the police interview, this alone does not necessitate a finding of police coercion, particularly where the police interviewing defendant also did not eat. Defendant's failure to eat a meal before he was arrested at approximately 11:00 a.m. can be attributed to his own eating habits, therefore his subsequent hunger is not necessarily indicative of police coercion. *See People v Young*, 212 Mich App 630, 635; 538 NW2d 456 (1995).

Additionally, defendant's allegations that the police used coercive tactics to obtain his inculpatory statement present a credibility issue. When evaluating the voluntariness of a statement, where a disputed issue turns on the credibility of witnesses, we defer to the superior vantage point of the trial court. *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000), quoting *People v Sexton (After Remand)*, 236 Mich App 525; 601 NW2d 399 (1999) (Murphy, J., dissenting). Because we are not left with the firm and definite conviction that the trial court's findings were mistaken, we decline to disturb them on appeal.

The appellate court rejected petitioner's argument that the trial court had committed

reversible error in advising that jury of its ruling that the statement was voluntary and had been

admitted into evidence:

We also reject defendant's argument that the trial court committed error warranting reversal when it informed the jury of its prior determination that defendant's statement was voluntary. In the instant case, that defendant gave the inculpatory statement was not disputed. During cross-examination defendant expressly acknowledged giving the statement.

Where the making of a statement is not a contested issue at trial, the trial court's comment to the jury regarding its prior determination of voluntariness does not amount to error requiring reversal. *People v Corbett*, 97 Mich App 438, 443; 296 NW2d 64 (1980).

(Op., 1-3).

The Michigan Court of Appeals found no violation of petitioner's rights under the

Confrontation Clause:

Defendant next asserts that he is entitled to a new trial because inadmissible hearsay evidence admitted at trial deprived him of his right to confront the witnesses against him under the United States and Michigan Constitutions.  US Const Am VI; Const 1963, art 1, § 20.  We disagree.

Whether defendant's right of confrontation was violated is a constitutional value we review de novo. *People v Cain*, 238 Mich App 95, 108; 605 NW2d 28 (2000). MRE 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Where a witness testifies that a statement was made, rather than about the truth of the statement itself, the statement is not hearsay.  *People v Harris*, 201 Mich App 147, 150-151; 505 NW2d 889 (1993).

Here, the disputed statements by the testifying police officer was made in the context of the prosecutor's direct-examination and defense counsel's cross-examination. During direct examination, after testifying that defendant initially denied being involved in the murder, the witness indicated that he continued to question defendant because "I had affirmation that [defendant] was in possession of a pistol." Later, in response to defense counsel's allegations that the witness coerced defendant into giving a statement, the witness testified, "the story I gave [defendant] was a story I obtained from [the codefendant], and I wanted [defendant] to understand."

Viewed in context, the record is clear that rather than to prove the truth of the matter asserted, these statements were offered to illustrate why the witness pursued his questioning of defendant after he denied involvement in the offense, and to refute defense allegations that the witness coerced defendant into giving a statement.  Because the statements were not offered to prove the truth of the matter asserted, they were not hearsay within the meaning of MRE 801(c).

Consequently, defendant's argument that the Confrontation Clause was violated by the admission of this testimony is without merit.  The primary purpose of the Confrontation Clause is to ensure the reliability of substantive evidence against the defendant by subjecting it to rigorous cross-examination before the trier of fact.  *People v Sammons*, 191 Mich App

-26-

351, 356; 478 NW2d 901 (1991). Here, defendant's failure to show that the disputed statements are hearsay is fatal to his claim that he was denied the right of confrontation. Statements that are not offered to prove the truth of the matter asserted do not implicate constitutional concerns under the Confrontation Clause.  *Cargill v Turpin*, 120 F3d 1366, 1375 (CA 11, 1997).  *See also Dutton v Evans*, 400 U.S. 74, 88; 91 S Ct 210; 27 L.Ed.2d 213 (1970).

(Op., 3-4).

      The Michigan Court of Appeals rejected  petitioner's argument that the trial court's

aiding-and-abetting instruction had been erroneous:

      Finally, defendant challenges the trial court's instruction to the jury on the law of aiding and abetting.  This issue is not properly before this Court because defendant did not raise a timely objection at trial.  *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994). Therefore we review this unpreserved claim of error relating to jury instructions for plain error.  *People v McCrady*, ___ Mich App ___; ___ NW2d ___ (Docket No. 215180, issued 12/19/00), slip op p 2; *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999). To avoid forfeiture of this claim, defendant must demonstrate plain error that affected his substantial rights. *Id.*

      We review jury instructions in their entirety to determine whether the trial court committed error requiring reversal.  *People v Canales*, ___ Mich App ___; ___ NW2d ___ (Docket No. 221452, issued 12/12/00), slip op, 2.  A trial court must instruct the jury concerning the law applicable to the case in an understandable manner.  *People v Henry*, 239 Mich App 140, 151; 607 NW2d 767 (1999).  Even where the trial court's instructions are somewhat imperfect, there is no error if the instructions, taken as a whole, fairly presented the issues to be tried and sufficiently protected the defendant's rights. *Id.*

      A jury may be instructed on aiding and abetting where there is evidence that (1) one or more persons were involved in committing the crime, and (2) the defendant's role in the crime may have been less than direct participation in the wrongdoing.  *People v Bartlett*, 231 Mich App 139, 157; 585 NW2d 341 (1998).  To prove guilt on an aiding and abetting theory, the prosecution must show that (1) defendant or some other person committed the underlying crime, (2) the defendant performed acts or gave encouragement that aided and assisted the commission of a crime, and (3) the defendant intended the commission of the crime, or had knowledge that the principal intended its commission at the time of giving aid or encouragement. *People v Smielewski*, 235 Mich App 196, 207; 596 NW2d 636 (1999); *People v King*, 210 Mich App 425, 431; 534 NW2d 534 (1995).  After reviewing the jury instructions, we are satisfied that the trial court properly instructed the jury with regard to the law of aiding and abetting.  Because defendant has not demonstrated plain error, he has forfeited this issue on appeal.

(Op., 4-5).

**D.      Application for Leave to Appeal to the Michigan Supreme Court**

On May 14, 2001, the Michigan Supreme Court Clerk's Office received petitioner's delayed application for leave to appeal, raising the issues rejected by the Michigan Court of Appeals. On May 18, 2001, the Clerk of the Michigan Supreme Court wrote a letter advising petitioner's attorney that the papers he had submitted would not be filed and would not be presented to the court "because more than 56 days (8 weeks) ha[d] elapsed since the decision of the Court of Appeals.  See MCR 7.302(C)(3).  Since the Rules provide for no exception to the 56-day limitation, the Court [would] not accept any further pleadings with respect to this matter."  (docket # 2, Ex. 3).

**E.      Habeas Corpus Petition, Stay and Abeyance, and Application for Post-conviction Relief**

Petitioner filed his petition for federal habeas corpus relief in this court on May 9, 2002, raising the four grounds rejected by the Michigan Court of Appeals.  This court applied the stay and abeyance procedure as previously described.

On November 18, 2004, plaintiff filed a motion for post-conviction relief in Van Buren County Circuit Court.  Petitioner argued that his appellate counsel had been constitutionally ineffective by failing to file a timely application for discretionary review by the Michigan Supreme Court resulting in the loss of a potential opportunity for review by the State's highest court of the four issues he had raised in his direct appeal.  On November 22, 2004, the Ingham County Circuit Court denied petitioner's motion for post-conviction relief.  (Copy found in Michigan Supreme Court Record, docket # 61, Application for Leave to Appeal, Ex. 6).  Judge Buhl held that

petitioner's appellate counsel had not been constitutionally ineffective in his failure to file a timely application for discretionary review of the issues rejected by the Michigan Court of Appeals.  On June 24, 2005, the Michigan Court of Appeals denied petitioner's application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (docket # 60). On January 27, 2006,  the Michigan Supreme Court denied petitioner's application for leave to appeal because petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (docket # 61).

## **Standard of Review**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review.  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); see *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010).  "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).  If a state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 180 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.")(quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94. The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington v. Richter*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Berghis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if that state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should apply or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle

to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010).

## Discussion

Respondent raises the defense of procedural default to all grounds raised by petitioner. Under a long line of Supreme Court cases, an adequate and independent finding of procedural default by the state courts will also bar federal habeas review of a federal claim, unless the habeas petitioner can show cause for the procedural default and prejudice attributable thereto. *See Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Harrington v. Richter*, 131 S. Ct. at 787. The doctrine of procedural default is applicable where petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *See Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010). The state may assert a procedural default when the last reasoned opinion of the state courts clearly relies on a procedural bar in refusing to consider a claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If a petitioner is guilty of a procedural default in the state courts, the federal habeas court will only entertain the defaulted issue if petitioner bears the burden of showing cause and prejudice or can show actual innocence. *Murray*, 477 U.S. at 485; *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994).

In the present case, all of the prerequisites to a finding of procedural default are present. The Michigan Court of Appeals held that petitioner's challenge to the trial court's aiding-and-abetting instructions had not been preserved by a timely objection at trial. The fact that the court went on to review the issue under the plain error standard does not constitute a waiver of the procedural default. *See Goodwin v. Johnson*, Nos. 06-3571, 06-3572, __ F.3d __, 2011 WL 181468,

at * 12 (6th Cir. Jan. 21, 2011); *Lundgren v. Michell*, 440 F.3d 754, 765 (6th Cir. 2006); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) ("Controlling precedent in our circuit indicates that plain error review does not constitute waiver of state procedural default rules.").  Further, the issues raised by petitioner in his appeal as of right were defaulted when petitioner failed to file a timely application for discretionary review by Michigan's highest court.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991).  Consequently, in the usual case, petitioner would have the burden of showing cause and prejudice or actual innocence to overcome the default.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Murray v. Carrier*, 477 U.S. at  488.

Both the Supreme Court and the Sixth Circuit have indicated, however, that the district court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008).  In the present case, the grounds raised by petitioner are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

## I.        Confrontation Clause

Petitioner argues that his Sixth Amendment rights under the Confrontation Clause were violated during the cross-examination of Agent King, when the jury learned that Israel Torres had made a statement to King indicating that petitioner had a gun.  Petitioner's problems in

defending this case stem from his own statements to the police, not any statement provided by Torres. No statement from Israel Torres was ever admitted into evidence against petitioner.

The Sixth Amendment's Confrontation Clause states that in all criminal prosecutions, the accused shall enjoy the right "to be confronted with the witnesses against him." U.S. Const. Am. VI. The Confrontation Clause is applicable to the States through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965). Petitioner's rights under the Confrontation Clause were protected under the Supreme Court's *Ohio v. Roberts* standard rather than the *Crawford* standard.[5] Because Israel Torres's statement was never offered into evidence against petitioner, the trial court had no occasion to determine whether Torres's statement bore sufficient indicia of reliability under *Ohio v. Roberts*.

Judge Buhl noted that when petitioner's attorney cross-examined Agent King and attempted to characterize the version of events provided as King's fabrication, he invited a response which denied fabrication and identified the source of the "story" in question. Further, the story provided an explanation, if believed by the jury, that could have provided a basis for acquittal. Petitioner has not shown that the state court decision finding no Confrontation Clause violation

---

[5] On March 8, 2004, the Supreme Court entered its *Crawford* decision, which overruled the Confrontation Clause standard established in *Ohio v. Roberts*, 448 U.S. 56 (1980). *See Crawford v. Washington*, 541 U.S. 36 (2004). *Roberts* had held that the Confrontation Clause permitted the admission of a hearsay statement made by a declarant who was unavailable to testify if the statement bore sufficient indicia of reliability, either because the statement fell withing a firmly rooted hearsay exception or because there were "particularized guarantees of trustworthiness" relating to the statement in question. 448 U.S. at 66. *Crawford* held that "testimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]." 541 U.S. at 59. The Supreme Court's decision in *Whorton v. Bockting*, 549 U.S. 406 (2007) established that *Crawford* announced a new rule that does not apply retroactively to cases already final on direct review. Petitioner's direct appeal concluded in 2001, years before the Supreme Court announced the new rule in *Crawford*. Accordingly, the *Roberts* standard applies.

resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Even assuming that a Confrontation Clause violation occurred, harmless error analysis applies.  *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  In Fry, the Supreme Court held that, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman [v. California*, 386 U.S. 18 (1967) ]."  551 U.S. at 121-22 (citations omitted).  Under the *Brecht* standard, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.' "  *Fry*, 511 U.S. at 116 (quoting *Brecht*, 507 U.S. at 631). The evidence against petitioner was overwhelming and the allegedly offending testimony was isolated. The purported violation of petitioner's Sixth  Amendment rights was insubstantial and did not have a substantial and injurious effect or influence on the jury's verdict.

## II.     Voluntariness of Petitioner's Statement

In Ground II, petitioner argues that his statement to Officer King was involuntary such that its use at trial violated his rights under the Fourteenth Amendment's Due Process Clause.  The Supreme Court has held that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that

-34-

they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).  The question in each of these cases is whether a defendant's will was overborne at the time he confessed.  *See Reck v. Pate*, 367 U.S. 433, 440 (1961); *see also Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) ("An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist."). Coercive police activity is necessary for a confession to be found involuntary under the Due Process Clause of the Fourteenth Amendment.  *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005).  Unconstitutional coercion may be mental as well as physical.  *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991).  In determining whether a defendant's will was overborne, the court looks at the totality of the circumstances surrounding the statement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006).  Factors considered in assessing the totality of the circumstances include the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep.  *Id.*

Petitioner's argument does not focus on the evidence presented to Judge Buhl at the time he made his ruling denying petitioner's motion to suppress.  Instead, petitioner relies primarily on excerpts of his own trial testimony which support an argument that his statement was coerced. Petitioner's presentation is decidedly one-sided.  He omits other portions of his trial testimony which would seriously undercut his coercion argument.  For example, his testimony that he had slept in until "ten, 10:30, close to 11" on the morning of his arrest (TT VI 101) would indicate that he was well-rested before he faced any questioning.  Petitioner argues that Judge Buhl was incorrect when

he found that although "petitioner had little to eat or drink, the officers had endured the same conditions" because Detective Sergeant VanLopik testified that he felt hungry when he left the Paw Paw post around 5:30 p.m. or 5:45 p.m. (TT IV, 96). VanLopik did not testify at the hearing on the motion to suppress. Further, petitioner ignores VanLopik's testimony that petitioner was asked whether he was hungry and received a negative response. (TT IV, 96). Trial testimony revealed that Officer Turanzas was in his forties (TT V, 4, 17), that he had the same thing to eat as petitioner, and his drink was a cup of coffee rather than a Coke. (TT V, 25).

Judge Buhl considered the appropriate factors and found that petitioner's statement was voluntary rather than coerced. The Michigan Court of Appeals agreed. Judge Buhl's factual findings, which were affirmed by the Court of Appeals, are entitled to a presumption of correctness under 28 U.S.C. § 2254(e). Petitioner has not rebutted them by clear and convincing evidence. The legal conclusions of the trial and appellate courts are likewise subject to deference under AEDPA. Petitioner has not shown that the state-court decision of voluntariness was contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

### III.    Instruction to the Jury on the Court's Evidentiary Ruling

Petitioner's Ground III is patently meritless. He argues that the trial court erred by informing the jury that the court had determined that petitioner's statement was voluntarily made. There is no general federal right to a properly instructed jury. With few exceptions, the substance of a jury instruction frames a matter of state law. *See Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991).

Consequently, a federal court may grant habeas relief based on errors in state jury instructions only in "extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (citing *Lewis v. Jeffers*, 497 U.S. 762, 780 (1990)). A habeas court may not grant relief on the basis of an allegedly erroneous instruction on evidence merely because it disagrees with the instruction. The only question in habeas corpus is "whether the ailing instruction itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *accord*, *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). Judge Buhl did not commit error in instructing petitioner's jury that the court determines the admissibility of evidence, and the jury determines credibility and the weight to give the evidence admitted.

In *Lego v. Twomey*, 404 U.S. 477, 490 (1971), the Supreme Court held that "the question of admissibility of evidence is a question for the court rather than the jury." The court determines whether a statement is voluntary. After the trial judge ruled on the coercion claim, petitioner was not entitled to have the jury determine the claim anew. *Id.* at 489. The jury remained free to assess the truthfulness of the statement, the credibility of the witnesses, and the weight, if any to give to the statement. *Id.* at 485-86; *Crane v. Kentucky*, 476 U.S. 683, 688 (1986)("'[Q]uestions of credibility, whether of a witness or of a confession, are for the jury,' the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial.") (quoting *Jackson v. Denno*, 378 U.S. 368, 386 n. 13 (1964)). Judge Buhl's instructions were entirely appropriate under the applicable Supreme Court precedent.

IV.     **Aiding and Abetting Instruction**

In Ground IV, petitioner argues that the trial court committed plain error in instructing the jury on aiding and abetting.  Petitioner cannot possibly overturn his conviction on this basis.  First, by reason of AEDPA, 28 U.S.C. § 2254(d)(1), a habeas corpus petitioner must ground his claim for relief on clearly established federal law as determined by the Supreme Court of the United States.  *See Premo v. Moore*, 131 S. Ct. at 743; *Renico v. Lett*, 130 S. Ct. at 1865-66.  Under this standard, the court must apply the "holdings" as opposed to the "dicta" of Supreme Court decisions as of the time of the relevant state-court decision.  *Thaler v. Haynes*, 130 S. Ct. 1171, 1173 (2010) ("A legal principle is 'clearly established' within the meaning of [section 2254(d)(1)] only when it is embodied in the holding of this Court."); *see Smith v. Anderson*, 632 F.3d 277, 281 (6th Cir. 2011).  Petitioner fails this test completely.  His brief in support of a delayed application for leave to appeal to the Michigan Supreme Court (which he has resubmitted to this court (docket # 2, Ex. 2)) fails to cite a single decision of the United States Supreme Court that suggests -- let alone holds -- that the federal Constitution is offended by the challenged aiding-and-abetting instruction.[6] Petitioner's challenge to the jury instruction therefore fails at the first step of analysis under AEDPA.

Moreover, petitioner cannot show that the instruction was erroneous, let alone that it so infected the fairness of the trial as to violate due process.  Unless a habeas petitioner can demonstrate that an instruction deprived the trial of "fundamental fairness," the validity of the instruction is a matter of state law.  Petitioner is unable to show that the instruction on aiding and

---

[6] Petitioner's August 9, 2005 Application for Leave to Appeal to the Michigan Supreme Court (docket # 61) suffers from the identical foundational flaws.

abetting was erroneous in any way, let alone undermined the fundamental fairness of his trial. Ground IV of the petition fails to establish any basis for habeas corpus relief.

### V.      Ineffective Assistance of Appellate Counsel

Ground V is petitioner's claim that his attorney's error caused him to forfeit an opportunity for discretionary review by the Michigan Supreme Court.  This claim of ineffective assistance of counsel cannot possibly rise to the level of a Sixth Amendment violation because petitioner did not have a right to counsel in connection with his application for discretionary review.

Review by the Michigan Supreme Court is discretionary. *See* MICH. CT. R. 7.301(A); *see also Daniels v. Burke*, 83 F.3d 760, 762 (6th Cir. 1996).  In *Wainwright v. Torna*, 455 U.S. 586 (1982), the Supreme Court addressed the issue of whether the Sixth Amendment right to counsel extended to discretionary review of criminal convictions by a state's supreme court.  The Florida Supreme Court had rejected as untimely Torna's application for a writ of *certiorari* to the Florida Supreme Court.  Torna's federal habeas corpus petition claimed that his Sixth Amendment right to the effective assistance of counsel had been violated when his counsel failed to file a timely application for *certiorari*.  The Supreme Court held that Torna did not have the constitutional right to counsel with regard to discretionary state-court appeals.  The Court concluded that, "Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely." 455 U.S. at 587-88.  On the same basis, petitioner cannot base a Sixth Amendment violation on an alleged error of counsel in connection with his application for discretionary review in the Michigan Supreme Court. Furthermore, he cannot show prejudice.  Discretionary review of criminal cases is granted rarely in

the Michigan system, and petitioner's appellate claims could not plausibly have merited discretionary review.

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:  September 14, 2011          /s/  Joseph G. Scoville
                                   United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).

-40-